UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| v. | ) | No.1:06-cv-104 |
| | ) | *Edgar* |
| FOUNTAINBLEAU APARTMENTS | ) | |
| L.P.; CLARK W. TAYLOR, INC.; | ) | |
| CLARK W. TAYLOR; JANE | ) | |
| MCELROY; CWT MANAGEMENT | ) | |
| INC.; AND ELIZABETH FOSTER, | ) | |
| | ) | |
| *Defendants.* | ) | |

**MEMORANDUM**

Plaintiff United States of America brings this action against Defendants Fountainbleau Apartments, L.P., Clark W. Taylor, Inc., Clark W. Taylor, Jane McElroy, CWT Management, Inc., and Elizabeth Foster (collectively "Defendants"). Plaintiff asserts claims under the Fair Housing Act, 42 U.S.C. §§ 3601 *et seq.* ("FHA") relating to Defendants' alleged discrimination against applicants with children who applied for housing at the Fountainbleau Apartments.

Plaintiffs move for partial summary judgment on the issue of liability only. [Court Doc. Nos. 19, 50]. Defendants oppose the motion. [Court Doc. No. 52]. The court has reviewed the record and the applicable law. After having reviewed the relevant legal authority, as well as the record, the court determines that Plaintiff's motion will be GRANTED.

    **I.**    **Background**

In general the parties do not dispute the material, relevant facts in this case. For purposes of this motion, the court must view the facts in the light most favorable to the Defendants. With

this admonition in mind, the facts are as follows.

Defendant Fountainbleau Apartments is located in East Ridge, TN. Fountainbleau Apartments L.P. owns and manages the Fountainbleau Apartments. Defendant Clark Taylor is the sole partner of Fountainbleau Apartments L.P. and the sole shareholder for Defendant Clark W. Taylor Inc. [Court Doc. Nos. 20-3, 50-4, Deposition of Clark W. Taylor ("Taylor Dep."), pp. 13-14]. Clark W. Taylor, Inc. and defendant Clark Taylor jointly own Fountainbleau Apartments, L.P. *Id.* Mr. Taylor is also the owner and president of Defendant CWT Management, Inc. *Id.* Defendant Elizabeth Foster is the resident manager of Fountainbleau Apartments. She has been the manager since July 3, 2000. [Court Doc. No. 20-3, p. 17, Deposition of Elizabeth Foster ("Foster Dep."), p. 9]. Defendant Jane McElroy is the property manager for both Fountainbleau Apartments and another apartment complex. Taylor Dep., p. 18.

The parties do not appear to dispute that it was the policy at the Fountainbleau Apartments prior to 2006 to inform prospective applicants with children that such families were not allowed to live there. Mr. Taylor testified that "ultimately" he was the one "who made the decision to implement the policy that this is a facility for 55 years or over." Taylor Dep., p. 54. Ms. McElroy may have also participated in the decision. *Id.* Mr. Taylor decided to make the complex an "all-adult facility." *Id.* at p. 60. He agreed that the policy was: "from 1981 to the present in the Fountainbleau Apartments, [Defendants] have not allowed individuals under the age of 21 to rent" and that Defendants "continued to deny residency for families with children in the Fountainbleau Apartments complex" from 1993 forward. *Id.* at 84.

Ms. Foster freely admitted in her deposition that Fountainbleau Apartments had a policy

against having children living full-time at the apartment complex. Foster Dep., pp. 145-46; *see also*, [Court Doc. No. 50-5, p. 12, Deposition of Jane McElroy ("McElroy Dep. II"), p. 92]. She testified that she told prospective applicants, including a tester from the United States Department of Justice, that only those who were "legally of age," meaning 21-years old or older could apply to live at the complex. *Id.* at 146. Ms. Foster also admitted that she directed prospective tenants with children to another apartment complex that accepted children. *Id*. Ms. Foster did not provide prospective tenants with children with a rental application or provide them with a tour of available apartments. *Id.* at 147-148.

Ms. Foster testified that she had no written criteria relating to prospective applicants and that she has not received any training regarding the FHA. Foster Dep., pp. 19, 23. She testified about her understanding of the age 55 and older requirement for the housing of older persons exemption in this way:

> A     The only thing I can tell you is that we were supposed to have 80% 55-and-older.
> Q     And is it accurate that the only thing that you did to attempt to comply with the 80% 55-years-or-over is do a tenant-profile in January 2004 and a tenant-profile in January 2005?
> A.    Yes, sir.
> Q     Okay. And do you have any other understanding of the 55-year-or-over exemption requirements?
> A     No, sir.

Foster Dep., p. 33. Ms. Foster testified that she created resident profiles to verify the ages of the complex's residents in 2004 and 2005. *Id.* at 44-47. She looked at the tenant rental applications to verify their ages, and she admits that some of the applications did not have an age or a date of birth listed. *Id.*; *see also*, p. 111. If the application did not have the information, Ms. Foster testified that she asked "some" of the residents how old they were or that she put down an age

because she "knew" the ages of her residents. *Id.* at 45. She did not use any other resources to determine the ages of the residents of Fountainbleau Apartments. *Id.* at 47. Ms. Foster is not aware of any documents that demonstrate that Fountainbleau Apartments published procedures or policies indicating an intent to house persons 55 years of age and over. *Id.* at 55, 61. Defendants do not have any tenant profiles other than those for 2004 and 2005 because in 2003, such tenant profiles were destroyed by flood. *Id.* at 77. Ms. Foster did not follow any procedures to verify the ages of the tenants in 2004 and 2005, such as photocopying driver's licenses or immigration identification. *Id.* at 80-82; *see also*, McElroy Dep. pp. 164-65.

The property manager, Jane McElroy, also admitted that Fountainbleau Apartments had a policy of trying to satisfy the 80% over 55-years of age exemption for the housing of older persons under the FHA. [Court Doc. No. 20-4, p. 5, Deposition of Jane McElroy ("McElroy Dep."), pp. 114-15]. However, Ms. McElroy testified that in 2004 the complex was not intended to be for only those residents age 55-years and older. McElroy Dep., p. 131. Mr. Taylor testified that he understood that Ms. McElroy made a telephone call to inquire about the requirements for satisfying the housing for older persons exemption. Taylor Dep., p. 69.

In discussing her accumulation of data for the 2004 tenant profile, Ms. Foster admitted that there was a "good possibility" that she was not "careful" because she "had a lot on [her] at the time, family-wise. And [she] may not have verified everything like [she] should have, other than verbally. And [she] should have pulled everybody's application that had one." Foster Dep., p. 111.

Defendants assert that the Fountainbleau Apartment complex was subject to an exemption for housing for older persons under the FHA. Mr. Taylor testified at his deposition

that he believed the apartment complex qualified for the exemption because of the age of the residents of the complex. Taylor Dep., p. 37. He asserted that Defendants fit within the exemption because "[i]t would be the age, if you made a list of all the residents with their age and then you said, well, we've got 80 percent of people who are 55 or older." *Id.* He further confirmed that his managers made a list of the ages of the residents of the complex. During the deposition, Mr. Taylor explained the procedure for verifying the ages of the residents:

> A      . . . what I should have done is I should have checked those, the math, the computation, and I didn't do it. And it's kind of unusual for me not to do that, but I just had so much confidence that, you know, they were doing it right. And so I did not check it.
> Q      Did you learn that they weren't doing it right?
> A      Only after this situation occurred.
> Q      So is it your understanding that you never actually had the 80 percent 55 years or older?
> A      Well, no, I couldn't – I wouldn't believe that, but I couldn't say that. You know, I would–I felt that we have had it from time to time. And there may have been other times we didn't have it, but the managers, you know, didn't change the policy. That's what I feel the situation is or they got sloppy and they didn't check it close and they didn't have it and they didn't necessarily know it. But that's what I feel happened.

Taylor Dep., pp. 38-39. Mr. Taylor admits that by 1981 the apartment complex was not allowing children. *Id.* at 59. Ms. McElroy testified that she learned about the 80% over 55 years of age requirement from the Chattanooga Housing Authority and that she never inquired with any other agencies regarding the requirements of the FHA. McElroy Dep. II, pp. 87-88. Aside from the 80% requirement, Ms. McElroy had no knowledge of any other requirements for compliance with the housing of older persons exemption to the FHA. *Id.*

A review of the tenants' rental applications and the tenant profiles for 2004 and 2005 reveals mistakes in the ages listed for several residents. *See* [Court Doc. No. 20-4, Affidavit of Donna Smith ("Smith Aff.")]. In some cases there is no information regarding birth date or age

in the rental application. In other cases, egregious errors of age have been made in the tenant profiles. For example, in the 2004 tenant profile, a tenant named John Forrister is listed as being 55 years of age. However, his birth date in the rental application is listed as 1972, which made him 31 years of age in 2004. Smith Aff., ¶ 5; [Court Doc. No. 20-4, pp. 25, 33]. Another tenant, a Mr. Chhom, was listed in the profile as being 61, when in fact the rental application states that he was 31 in 2004. [Court Doc. No. 20-4, p. 23, 32]. The most glaring discrepancy was the tenant profile listing for a Ms. Huey with an age of 55, when the tenant application revealed an age of 19 in 2003. *Id.* at pp. 27, 44. Similar errors can be found in the 2005 tenant profile. *See* Smith Aff., ¶¶ 9-10. When the ages are recalculated and verified using the rental applications, fewer than 80% of the units were rented to individuals aged 55 and over in both 2004 and 2005. Smith Aff., ¶¶ 6-7, 11-12.

Defendants do not seriously dispute the discrepancies. When confronted with the differences between some of the information in the tenant profile and the rental applications, Ms. Foster agreed that she made mistakes when creating the tenant profiles. [Court Doc. No. 53-2, Deposition of Elizabeth Foster ("Foster Dep. II"), pp. 90-92, 96-98, 103-108]. Defendants argue that there is no way of knowing whether the tenant profiles were accurate and the rental applications were false. Mr. Taylor admitted in his deposition that the Defendants did nothing independently to verify an applicants age:

> Q But you would agree with me that simply asking an applicant is not an independent verification of the applicant's age?
> A I agree, it does not meet the requirements of the Act that we were not aware of.

Taylor Dep. II, pp. 75-76. He further testified:

> Q And, in fact, they did not obtain proof that [Ms. Foster and Ms. McElroy]

>independently verified the ages of applicants by making photocopies of any type of valid form of ID that reflected age or date of birth; is that correct?
>A     No, they didn't.

Taylor Dep. II, p. 106.

Mr. Taylor testified that Fountainbleau Apartments did not advertise that it was an "adult-only facility." [Court Doc. No. 50-6, Deposition of Clark W. Taylor ("Taylor Dep. II"), p. 65]. Defendants attempted to "imply" that the complex was intended for a more elderly population. *Id.* There were no specific advertisements stating that the Fountainbleau Apartments were restricted to persons over 55 years of age. *Id.* at 67. Ms. McElroy testified that a sign in the office of the Fountainbleau Apartments indicated that the complex was for "The Settled Set" McElroy Dep. II, p. 145. She indicated that this sign meant that "we don't rent to swingers and party people." *Id.*

The United States Department of Justice conducted testing to determine whether the Defendants complied with the FHA. *See e.g.* Foster Dep., p. 143. Ms. Foster admits that the taped conversation between her and the tester was accurate and that Ms. Foster informed the tester, Lauren Sauer, that Fountainbleau Apartments did not accept children. She then referred Ms. Sauer to two other complexes that accepted children. *Id.* at pp. 143-148.

**II.     Standard of Review**

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The burden is on the moving party to show conclusively that no genuine issue of material fact exists, and the Court must view the facts and all inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,475 U.S. 574, 587

(1986); *Morris v. Crete Carrier Corp.*, 105 F.3d 279, 280-81 (6th Cir. 1997); *White v. Turfway Park Racing Ass'n, Inc.*, 909 F.2d 941, 943 (6th Cir. 1990); *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987).

Once the moving party presents evidence sufficient to support a motion under Fed. R. Civ. P. 56, the nonmoving party is not entitled to a trial merely on the basis of allegations. The nonmoving party is required to come forward with some significant probative evidence which makes it necessary to resolve the factual dispute at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *White*, 909 F.2d at 943-44; *60 Ivy Street*, 822 F.2d at 1435. The moving party is entitled to summary judgment if the nonmoving party fails to make a sufficient showing on an essential element of the nonmoving party's case with respect to which the nonmoving party has the burden of proof. *Celotex*, 477 U.S. at 323; *Collyer v. Darling*, 98 F.3d 211, 220 (6th Cir. 1996).

The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of fact a proper jury question, and not to weigh the evidence, judge the credibility of the witnesses, and determine the truth of the matter. *Anderson v. Liberty Lobby*, 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *60 Ivy Street*, 822 F.2d at 1435-36. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see also Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 140 (6th Cir. 1997). If the Court concludes that a fair-minded jury could not return a verdict in favor of the nonmoving party based on the evidence presented, it may enter a summary judgment. *Anderson*, 477 U.S. at 251-52; *University of Cincinnati v.*

*Arkwright Mut. Ins. Co.*, 51 F.3d 1277, 1280 (6th Cir. 1995); *LaPointe v. UAW, Local 600*, 8 F.3d 376, 378 (6th Cir. 1993).

### III. Analysis

The FHA provides that it is unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of . . . familial status . . . ." 42 U.S.C. § 3604(a). The FHA further precludes representing "to any person because of . . . familial status, . . . that any dwelling is not available for . . . rental when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

In 1988 Congress amended the original FHA to prohibit discrimination on the basis of "familial status." *See United States v. Branella*, 972 F.Supp. 294, 297 (D.N.J. 1997). The Act defines "familial status" as a person or persons under eighteen living with "a parent or another person having legal custody" or with "the designee of such parent or other person having such custody, with the written permission of such parent or other person." 42 U.S.C. § 3602(k). "Congress expanded the Fair Housing Act to protect against familial status discrimination in light of an express concern for the plight of single-parent families, young families with children, and poor families." *Branella*, 972 F.Supp. at 297 (citing *United States v. Lepore*, 816 F.Supp. 1011, 1017 (M.D. Pa. 1991)).

A housing discrimination claim may be proved by using either the disparate treatment method or the disparate impact method. *Marbly v. Home Properties of New York*, 205 F.Supp.2d 736, 739 (E.D. Mich. 2002). The Sixth Circuit analyzes FHA disparate treatment claims by utilizing the burden shifting test first described in *McDonnell Douglas Corp. v. Green*, 411 U.S.

792 (1973). *See Mencer v. Princeton Square Apts.*, 228 F.3d 631, 634 (6th Cir. 2000). The Sixth Circuit explained in *Mencer*:

> [c]ourts have adapted this test to fair housing claims by requiring the plaintiff to first establish a *prima facie* case of discrimination. Then, in response, the defendant must offer a legitimate nondiscriminatory reason for the housing decision made. Finally, the plaintiff must show that the proffered reason is a pretext that masks discrimination.

*Id.* (citing *Selden v. United States Dep't of Hous. and Urban Develop.*, 785 F.2d 152, 160 (6th Cir. 1986)). The Sixth Circuit has outlined a prima facie case of housing discrimination:

> A *prima facie* housing discrimination case is shown when the plaintiff proves: (1) that he or she is a member of a [protected class], (2) that he or she applied for and was qualified to rent or purchase certain property or housing, (3) that he or she was rejected, and (4) that the housing or rental property remained available thereafter.

*Mencer*, 228 F.3d at 634-35; *see also Llanos v. Estate of Coehlo*, 24 F.Supp.2d 1052, 1056 (E.D. Cal. 1998) (applying prima facie case to discrimination based on familial status).

However, this prima facie case was " 'never intended to be rigid, mechanized, or ritualistic.'" *Selden*, 785 F.2d at 161 (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481 (1982)). In a case involving alleged disparate treatment of African-American renters and white renters, the district court examined whether the plaintiff "was denied housing benefits that were otherwise available to non-minority tenants, or that the legitimate reasons proffered by [the defendant] for its treatment of plaintiff were a mere pretext for race discrimination." *Marbley*, 205 F.Supp.2d at 744. To prevail on a disparate treatment in housing claim, a plaintiff must "come forward with evidence that he was treated differently than 'similarly situated' tenants." *Id.* at 745. Other district courts have phrased the disparate treatment analysis in this way:

> [t]o establish a *prima facie* case of disparate treatment predicated upon 42 U.S.C. § 3604(b) the plaintiffs must make a modest showing that a member of a statutorily protected class was not offered the same terms, conditions or privileges of rental of a dwelling or not provided the same services or facilities in connection therewith made available to others under circumstances giving rise to a reasonable inference of prohibited discrimination.

*Khalil v. Farash Corp.*, 452 F.Supp.2d 203, 208 (W.D.N.Y. 2006) (quoting *United States v. Town Hall Terrace Ass'n*, No. 95-CV-0533, 1997 WL 128353 *4 (W.D.N.Y. Mar. 14, 1997)); *see also, Grant v. Kingswood Apartments*, No. 01-1523, 2001 WL 1622202 (E.D. Penn. Dec. 18, 2001) (adapting McDonnell Douglas prima facie case to circumstances alleging disparate treatment by ignoring African-American tenant's complaints of residential facility rule violations).

Federal courts have held that a practice known as "steering" an individual away from an adult only area into a family area is a form of violation of the FHA. *See e.g. Llanos*, 24 F.Supp.2d at 1057. "Steering is not an 'outright refusal to rent to a person within a class of people protected by the statute; rather it consists of efforts to deprive a protected homeseeker of housing opportunities in certain locations.'" *Id.* (quoting *Department of Housing and Urban Dev. v. Edelstein*, 1991 WL 442784 at *4 (H.U.D. 1991)). In addition, "providing false information on the availability of rental units because of a party's [protected status] violates the statute and creates a cause of action." *Woods v. Beavers*, 1991 WL 311, 922 F.2d 842 *4 (6th Cir. Jan. 3, 1991) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)). Courts have sanctioned the use of "testers" or persons "who, without an intent to rent or purchase a home or apartment, pose as renters or purchasers for the purpose of collecting evidence of unlawful steering practices." *Havens Realty Corp.*, 455 U.S. at 373. The use of testers is a permissible method of ferreting out discrimination under the FHA. *See Woods*, 922 F.2d at *4 n.2; *Havens*

*Realty Corp.*, 455 U.S. at 373-374; *Richardson v. Howard*, 712 F.2d 319, 321 (7th Cir. 1983). Further, a tester has standing to sue under the FHA. *See*, *Havens Realty Corp.*, 455 U.S. at 373-374; *Richardson*, 712 F.2d at 322 n.2.

To demonstrate actionable discrimination, a defendant's "misconduct must be more than isolated to rise to the level of actionable pattern or practice," however "there is no threshold number of incidents that must occur before the Government may initiate litigation." *United States v. Garden Homes Management, Corp.*, 156 F.Supp.2d 413, 420 (D.N.J. 2001).

In addition, federal courts have determined that property owners may be held liable for the discrimination of their agents under the theory of respondeat superior. "It is well established that 'the duty of a property owner not to discriminate in the leasing or sale of that property is non-delegable.' Thus, a property owner is liable for the conduct of his employees despite instructions to them not to discriminate." *Llanos*, 24 F.Supp.2d at 1061 (quoting *Walker v. Crigler*, 976 F.2d 900, 904 & n.5 (4th Cir. 1992)); *see also*, *Marr v. Rife*, 503 F.2d 735, 741 (6th Cir. 1974); *Stewart v. Furton*, 774 F.2d 706, 709 (6th Cir. 1985).

The parties do not dispute that Defendants discriminated against prospective tenants on the basis of familial status. Ms. Foster, Mr. Taylor, and Ms. McElroy all testified regarding Fountainbleau Apartments' "adult-only" policy. Mr. Taylor confirmed that he initiated the policy and that Ms. McElroy and Ms. Foster both facilitated it. Further, Mr. Taylor is the sole shareholder of Defendants Fountainbleau Apartments L.P., Clark W. Taylor, Inc., and CWT Management Inc. Ms. Foster did not provide rental applications to families with children, did not show such persons available units, and she suggested that they try apartment complexes that accepted children. Foster Dep., pp. 145-148. The Defendants described this policy in different

ways, sometimes expressing it as an "adult only" policy, sometimes referring to tenants as needing to be "legally of age" or over 21, and sometimes expressing it as a policy to limit tenants to persons aged 55 years and over. Despite the different ways of explaining the policy, Defendants agree that it was the policy to deny families with children the right to apply for housing at Fountainbleau Apartments. They contend, however, that Fountainbleau Apartments met the requirements for the housing for older persons exemption, an exception to the FHA's prohibition against discrimination of persons on the basis of familial status.

### 1. Exemption for Housing "for Older Persons"

The FHA provides an exception for discrimination on the basis of familial status for housing "for older persons." 42 U.S.C. § 3607(b)(1). This is an affirmative defense, and the Defendants bear the burden of proving the requirements of the exception. *See Hooker v. Weathers*, 990 F.2d 913, 916 (6th Cir. 1993); *Gibson v. County of Riverside*, 181 F.Supp.2d 1057, 1076 (C.D. Cal. 2002); *Fair Housing Advocates Ass'n, Inc. v. City of Richmond*, 209 F.3d 626, 634 (6th Cir. 2000). Further, courts construe the exception narrowly. *Gibson*, 181 F.Supp.2d at 1076; *Fair Housing Advocates Ass'n, Inc.*, 209 F.3d at 634; *United States v. City of Hayward*, 36 F.3d 832, 837 (9th Cir. 1994); *Simovits*, 933 F.Supp. at 1402 n.18.

The Act defines "housing for older persons" in part as housing:

> intended and operated for occupancy by persons 55 years of age or older, and –
> (i) at least 80 percent of the occupied units are occupied by at least one person who is 55 years of age or older;
> (ii) the housing facility or community publishes and adheres to policies and procedures that demonstrate the intent required under this subparagraph; and
> (iii) the housing facility or community complies with rules issued by the Secretary for verification of occupancy, which shall–
>     (I) provide for verification by reliable surveys and affidavits; and
>     (II) include examples of the types of policies and procedures relevant to a determination of compliance with the requirements of clause (ii). Such

surveys and affidavits shall be admissible in administrative and judicial
proceedings for the purposes of such verification.

42 U.S.C. § 3607(b)(2). The exemption requires that all three elements be met. *See Simovits v. Chanticleer Condominium Ass'n.*, 933 F.Supp. 1394, 1402 (N.D. Ill. 1996).

The Department of Housing and Urban Development ("HUD") has also issued regulations implementing the FHA. These regulations provide that:

> (a) In order for a housing facility or community to qualify as housing for older persons under § 100.304, at least 80 percent of its occupied units must be occupied by at least one person 55 years of age or older.
> (b) For purposes of this subpart, occupied unit means:
>    (1) A dwelling unit that is actually occupied by one or more persons on the date that the exemption is claimed; or
>    (2) a temporarily vacant unit, if the primary occupant has resided in the unit during the past year and intends to return on a periodic basis.
> (c) For purposes of this subpart, occupied by at least one person 55 years of age or older means that on the date the exemption for housing designed for persons who are 55 years of age or older is claimed:
>    (1) At least one occupant of the dwelling unit is 55 years of age or older; or
>    (2) If the dwelling unit is temporarily vacant, at least one of the occupants immediately prior to the date on which the unit was temporarily vacated was 55 years of age or older.

24 C.F.R. § 100.305. The regulations regarding intent to operate as housing for older persons indicates that:

> (a) In order for a housing facility or community to qualify as housing designed for persons who are 55 years of age or older, it must publish and adhere to policies and procedures that demonstrate its intent to operate as housing for persons 55 years of age or older. The following factors, among others, are considered relevant in determining whether the housing facility or community has complied with this requirement:
>    (1) The manner in which the housing facility or community is described to prospective residents;
>    (2) Any advertising designed to attract prospective residents;
>    (3) Lease provisions;
>    (4) Written rules, regulations, covenants, deed or other restrictions;
>    (5) The maintenance and consistent application of relevant procedures;
>    (6) Actual practices of the housing facility or community; and

(7) Public posting in common areas of statements describing the facility or community as housing for persons 55 years of age or older.

24 C.F.R. § 100.306.

The regulations further provide for procedures for verifying occupancy. These regulations state in part:

> (a) In order for a housing facility or community to qualify as housing for persons 55 years of age or older, it must be able to produce, in response to a complaint filed under this title, verification of compliance with § 100.305 through reliable surveys and affidavits.
> (b) A facility or community shall, within 180 days of the effective date of this rule, develop procedures for routinely determining the occupancy of each unit, including the identification of whether at least one occupant of each unit is 55 years of age or older. Such procedures may be part of a normal leasing or purchasing arrangement.
> (c) The procedures described in paragraph (b) of this section must provide for regular updates, through surveys or other means, of the initial information supplied by the occupants of the housing facility or community. Such updates must take place at least once every two years. . . .
> (d) Any of the following documents are considered reliable documentation of the age of the occupants of the housing facility or community:
>     (1) Driver's license;
>     (2) Birth certificate;
>     (3) Passport;
>     (4) Immigration card;
>     (5) Military identification;
>     (6) Any other state, local, national, or international official documents containing a birth date of comparable reliability; or
>     (7) A certification in a lease, application, affidavit, or other document signed by any member of the household age 18 or older asserting that at least one person in the unit is 55 years of age or older.

24 C.F.R. § 100.307.

The Sixth Circuit has described the exception in this way:

To qualify for the "older persons" exception, the defendants must show that: 1) at least 80% of the units are occupied by at least one person age 55 or older; 2) that they have published and adhered to policies and procedures that demonstrate an intent to restrict leasing to those age 55 or older; and 3) that they provide services specifically designed to meet the needs of older persons or, if the provision of

such services is impractical, that the [defendant housing community] is needed to
provide important housing opportunities for older persons in the community.

*Hooker v. Weathers*, 990 F.2d 913, 915 (6th Cir. 1993) (citing 24 C.F.R. § 100.304; *Rogers v. Windmill Pointe Village Club Assoc., Inc.*, 967 F.2d 525, 527 (11th Cir. 1992)); *Gibson v. County of Riverside*, 181 F.Supp.2d 1057, 1075-76 (C.D. Cal. 2002); 42 U.S.C. § 3607(b)(2)(C).

In *Gibson* the district court concluded that the defendant county did not qualify for the housing for older persons exception for three reasons.

> First the County has failed to present sufficient probative evidence to establish as a genuine issue of fact that at any time during that period, eighty percent of the dwelling units in the areas zoned as [age-restricted] were occupied by at least one person aged 55 or over. Second, the County has offered no evidence that at any time during that period it adhered to policies and procedures demonstrating its intent to provide housing for persons 55 years or older. The Court also concludes as a matter of law that the County did not qualify as 55-or-over HOP from March 12, 1989 to May 19, 1993 for a third reason. During that period, the County failed to publish a policy and procedure which sufficiently demonstrated its intent to provide housing for persons 55 years or older.

*Gibson*, 181 F.Supp.2d at 1077. In *Gibson* the court required the defendant county to produce sufficient evidence that it qualified for the 55-or-over requirement during the years at issue. *Id.* The court further noted that to satisfy the requirement of procedures in place, "[t]ypically such a procedure involves some kind of age-verification. The procedure must exist prior to the allegedly discriminatory acts and must have some degree of reliability. Finally, the procedure must be performed on a consistent basis." *Id.* at 1079 (citing *Massaro v. Mainlands 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472, 1478-79 (11th Cir. 1993)). Courts have also determined that an intent to house older persons is not demonstrated by a prohibition against children under a certain age, such as sixteen. *See e.g., Massaro*, 3 F.3d at 1479; *Simovits*, 933 F.Supp. at 1403. Further, demonstration of such an intent requires explicit rules and regulations restricting occupancy to

persons fifty-five years of age or older.  *Simovits*, 933 F.Supp. at 1403 (citing *Massaro*, 3 F.3d at 1479).

Defendants do not present this court with a difficult case.  Although they maintain that they attempted to meet the housing for older persons exemption, they can demonstrate very little evidence that they did in fact meet the three requirements of the exemption.  The only requirement that they attempt to meet is the requirement that 80% of the residents be 55 years of age and older.  However, they cannot demonstrate a genuine issue of material fact that they met even this requirement.  Although they created tenant profiles for 2004 and 2005, the record reveals that the tenant profiles are rife with error based on the information provided in the tenant applications.  Defendants claim that it is entirely possible that the tenant applications are incorrect and that the tenant profiles in fact list the correct ages of the tenants.  However, this argument has little merit.  Regardless of whether the actual ages and birth dates provided by the tenants themselves on their applications are incorrect and the ages listed in the tenant profiles are more accurate, which is doubtful, Defendants have the burden of demonstrating that they verified the ages of their residents.  Defendants plainly agree that they did not do so.  Ms. Foster admitted that she did not ask for any independent verification, such as a driver's license, to confirm a tenant's age.  In some cases, where there was no age or date of birth listed on the application, Ms. Foster simply guessed the tenant's age.  Defendants fail to satisfy the requirements in the regulations that they provide independent verification of the ages of their residents.  *See* 24 C.F.R. § 100.307.  Thus, they cannot meet two of the requirements of the exception because they cannot demonstrate that 80% of its residents were over the age of 55 during the relevant time period, nor can they demonstrate that they had sufficient procedures in place to verify the ages of

such residents.

In addition, Defendants utterly fail to demonstrate any level of compliance with the other requirement of the exemption that they had policies and procedures in place to demonstrate an intent to provide housing only for older persons. Defendants admit that they did not advertise the Fountainbleau Apartments as housing for persons over 55 years of age. In fact, it appears that the complex only excluded persons under 21 years of age, not persons under 55 years of age. Thus, Defendants did not have any written policies, procedures, advertisements, lease provisions, rules, explicit declarations of age restrictions, or other indicia of an intent to provide housing only to older persons. Defendants maintain that they attempted to imply that the complex was intended for a "settled set" or those who were not swingers and who did not party. This does not meet the requirements of the exemption.

In addition, Defendants provide no evidence indicating that Fountainbleau Apartments was a traditional retirement community with any traditional retirement community facilities, activities, social clubs, meal sharing programs, health care providers, or any other common signifiers of retirement communities.

Defendants claim that they were ignorant of the requirements of the FHA. However, Defendants made the conscious decision to discriminate against families with children at Fountainbleau Apartments without conducting any probing inquiry into whether such discrimination was legal. Ignorance of the law has never been a defense to liability. Defendants fail to sustain their burden of proof that they meet the requirements of the affirmative defense of housing for older persons.

Ms. Foster, Ms. McElroy, and Mr. Taylor all implemented the "adult only" policy. Mr.

Taylor is the sole shareholder for Defendants Fountainbleau Apartments, L.P., CWT Management Inc., and Clark W. Taylor, Inc. Each of these Defendants share ownership and management obligations for the Fountainbleau Apartments. These Defendants are liable under the theory of respondeat superior. Therefore, the court will GRANT Plaintiff's motion for summary judgment on the issue of liability.

### IV.     Conclusion

For the reasons stated *supra*, this court will GRANT Plaintiff's motion for summary judgment. The parties should be prepared to proceed to trial on the issue of injunctive and monetary relief.

A separate order will enter.

*/s/ R. Allan Edgar*
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE
